UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MILNOT HOLDING CORPORATION,

                      Plaintiff,            DECISION AND ORDER

-vs-

                                              08-CV-6140 CJS

THRUWAY PRODUCE, INC.,

                      Defendant.

_____

THRUWAY PRODUCE, INC.,

                      Third-Party Plaintiff,

-vs-

R.M. ZINGLER FARMS, LYNOAKEN FARMS, INC.,
K.M. DAVIES CO., INC., ORCHARD DALE FRUIT
FARM, INC. and C.W. COLD STORAGE, INC.,

                      Third-Party Defendants.

_____

INTRODUCTION

      This is a diversity action for breach of a contract between an apple supplier and a baby food manufacturer. Now before the Court is Plaintiff's motion for partial summary judgment. (Docket No. [#114]). The application is granted.

BACKGROUND

      Unless otherwise noted, the following are the undisputed facts of this case viewed in the light most-favorable to defendant Thruway Produce, Inc. At all relevant times, Plaintiff owned Beech-Nut Nutrition Corporation ("Beech-Nut"), which operated a food processing plant in Canajoharie, New York. The Beech-Nut plant produced "an assortment of baby and toddler food products." Complaint [#1] at ¶ 8. In 2005, Plaintiff and Defendant

entered into a contract whereby Defendant agreed to be the exclusive supplier of apples to Plaintiff, "for the 2005/2006 season." *Id*. at ¶ 9.  Defendant purchased the apples from various growers, stored the apples at various storage facilities, and provided the apples to Plaintiff as needed.

It is undisputed that Defendant knew that Plaintiff would use the apples to make baby food and related food products.  The parties' contract required Defendant to provide apples that were free of the rodenticides Brodifacoum and Bromadiolone, which are commonly found in baits used to kill rats and mice.[1]  However, on four occasions in 2006, Plaintiff found Brodifacoum and/or Bromadiolone mixed in with apples that had been supplied by Defendant.  More specifically, Plaintiff discovered rodenticide amongst Defendant's apples on January 23, 2006, January 27, 2006, February 13, 2006 and March 20, 2006.[2]

On January 23, 2006, as a load of apples was moving along Plaintiff's production line, an employee discovered several rodenticide pellets,[3] some of which were embedded in apples and some of which had fallen into the processing machinery.  Plaintiff notified Defendant of the incident, and Defendant responded that one of its suppliers, Orchard

---

[1] Plaintiff, citing contractual provisions, indicates that the contract required that the apples be entirely free of those chemicals. See, Pl. Stmt. of Facts [#114-1] at ¶ ¶ 5-6.  In its counter-statement of facts, Defendant vaguely responds that Plaintiff's assertion is an "unsupported legal conclusion." Def. Opp. Stmt. of Facts.  However, Defendant does not seriously argue that the contract permitted it to supply Plaintiff, a baby food manufacturer, with apples tainted by rat poison. *See*, Def. Memo of Law [#121] at p. 4 ("Thruway concurs with the formation of the subject apple contract and the terms of the contract as stated by Plaintiff's counsel.").

[2] Defendant's counter-statement of facts points out that on one prior occasion, in March 2004, Plaintiff discovered a single rodenticide pellet in a drain in the processing equipment.  However, as discussed below, there is no reasonable inference linking that incident with the four incidents at issue in this action.

[3] The New York State Department of Agriculture & Markets ("Ag. & Markets"), as well as an independent agency, tested the pellets and determined that they contained Brodifacoum.

Dale, used rodenticide pellets similar to what was found.[4] Plaintiff determined, though, that the apples being processed at the time of the discovery were not Orchard Dale's. Instead, it appears that the apples being processed came from three of Defendant's suppliers: C.W. Cold Storage ("C.W."), Lynoaken Farms ("Lynoaken") and K.M. Davies ("Davies"). Nevertheless, Plaintiff returned all of Orchard Dale's apples to Defendant, along with the remainder of the apples that were being processed at the time of the rodenticide discovery.

On January 27, 2006, as apples were being processed, one of Plaintiff's employees discovered two rodenticide pellets in the processing machinery. The apples that were being processed at that time came from Lynoaken and Davies. Plaintiff notified Defendant of the discovery the same day, and Defendant agreed to take back the remainder of the lot of apples being processed at the time.

On February 13, 2006, Plaintiff contacted an Investigator with the U.S. Food and Drug Administration's ("FDA") Office of Criminal Investigation about the two aforementioned incidents. Plaintiff indicated that it was unsure whether the rodenticide came from Defendant's suppliers or from a person inside the plant.[5] The FDA Investigator made an appointment to meet with Plaintiff on February 21, 2006. Later that same day,

---

[4]See, Appendix to Plaintiff's Statement of Facts, Ex. 38, deposition of Eric Brown.

[5]Defendant's counter-statement of facts asserts that the FDA actually first became aware of the problem "by an anonymous employee complaint that the source of the rodenticide found *was the result of tampering by a Beech-Nut employee*." (emphasis added). However, the evidence that Defendant cites for that idea does not support the assertion. Instead, the evidence indicates that someone made an anonymous complaint that "*the company* was allowing rodenticide to enter in through the apple dump site and actually get into the product." See, Knotts Dep. at p. 21. Consequently, Defendant's contention, that the FDA became involved because of a complaint of employee tampering, is unsupported. The record does also indicate that one of Plaintiff's supervisors, Jeffrey Heiser, contacted the FDA's Criminal Investigation Office because he thought there was a *possibility* of internal tampering, since two years earlier, there had been an incident in which an employee apparently threw a plastic bottle into the processing machinery. Heiser Dep. at pp. 68-69 ("Because we wanted to make sure that we didn't have a tampering going on internally. So we thought by contacting the FDA and being an investigator, they would come in and help us investigate the situation.") [sic] Again, though, such evidence does not support Defendant's contention that the FDA became involved because of an anonymous complaint of employee tampering.

one of Plaintiff's forklift drivers was dumping a load of apples into the processing hopper when he observed foreign objects mixed in with the apples. Upon inspection, Plaintiff found four rectangular plastic containers, with holes cut in them, which appeared to be homemade rodent bait stations. The boxes contained a bluish-green rodenticide material in both solid and granular form. The same material was discovered adhering to the apples that had just been dumped into the hopper, and to the bin from which the apples had been dumped. Plaintiff determined that the bin from which the apples had come belonged to a grower named Zingler ("Zingler"), and that the apples had been previously stored at C.W. Cold Storage. Plaintiff notified Defendant of the incident the same day. Plaintiff also re-contacted the FDA Investigator and informed him about the latest incident.

On or about February 16, 2006, Defendant notified Plaintiff that C.W. Cold Storage admitted using homemade plastic rodent traps like the ones discovered.

On February 21, 2006, Plaintiff met with the FDA Investigator, and provided him with reports and photographs concerning the three incidents of contamination.

On February 22, 2006, Defendant notified Plaintiff that it had found a rodenticide pellet in one of Orchard Dale's bins of apples.

On February 23, 2006, the Canojoharie Police Department informed Plaintiff that it had received a copy of a letter that had been sent to Ag. & Markets, which alleged that Defendant was permitting contaminants to enter into the food product. The following day, Plaintiff met with representatives of the Canojoharie Police and Ag. & Markets, and provided them with copies of reports relating to the rodenticide incidents. On February 27, 2006, an FDA Investigator met with Plaintiff to discuss the incidents, review the evidence and tour the processing plant. The following day, February 28, 2006, FDA Investigators returned and conducted additional investigation into the three rodenticide incidents.

Between March 1, 2006 and March 20, 2006, Plaintiff met with FDA investigators on approximately eleven occasions, to discuss the three rodenticide incidents and Plaintiff's subsequent handling of the food products that were being produced at the time of the contaminations.

On March 20, 2006, Plaintiff's employees were dumping apples onto the production line when an employee observed what appeared to be a mouse nest among the apples. Upon inspection, Plaintiff found a rodenticide pellet near the mouse nest. Plaintiff also observed that some of the apples had rodent "gnaw marks."

There is no evidence that Plaintiff used Brodifacoum or Bromadiolone at its plant, and consequently it appears that the poison came from outside the processing plant. Lynoaken and Davies each deny that they used rodenticide at their establishments. However, as noted earlier, Orchard Dale and C.W. Cold Storage both acknowledge using rodenticide. With regard to Orchard Dale, Defendant admits that it saw rodenticide pellets on the floor of Orchard Dale's storage facility. With regard to C.W. Cold Storage's homemade bait boxes, C.W. indicates that it used only solid bait blocks in the traps, but the Beech-Nut employee who found the boxes indicated that the rodenticide inside was in "granular" form, though he could not recall whether it was specifically in pellet form. Appendix to Plaintiff's Statement of Facts, Ex. 36, Gerhartz Dep. at p. 32.

On March 27, 2008, Plaintiff commenced this action. The Complaint [#1] asserts the following seven causes of action: 1) breach of contract; 2) breach of implied warranty of merchantability; 3) breach of implied warranty of fitness for a particular purpose; 4) breach of implied warranty for the sale of food; 5) breach of express warranty; 6) negligence; and 7) strict liability. Following a period of discovery, on January 21, 2011, Plaintiff filed the subject motion [#114] for partial summary judgment on the first, second,

third and fifth causes of action. Essentially, Plaintiff maintains that Defendant agreed to provide apples that were free of rodenticide, and failed in that regard, since rodenticide was discovered in the apples. Plaintiff seeks partial-summary as to liability.

In opposition to the motion, Defendant does not dispute that it was required to provide apples that were free of rodenticide, or that rodenticide was discovered while its apples were being processed. However, Defendant maintains that there is a triable issue of fact as to the source of the rodenticide. Specifically, Defendant contends that there is evidence indicating that the rodenticide was introduced by one of Plaintiff's employees as an act of sabotage.

## DISCUSSION

*Rule 56*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the

litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . . and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

The elements of the various causes of action are not in dispute, and the Court will therefore not discuss them.

Instead, the Court will focus on Defendant's argument that there is a triable issue of fact as to "the genesis of the rat poison." *See*, Def. Memo of Law [#121] at pp. 3-4 ("There exists ample evidence in the record to establish that there is a genuine dispute for a trier of fact as to whether the subject rat poison came from the apples provided by Thruway or through employee tampering at the Beech-Nut Plant.").[6] The facts upon which Defendant relies to support this argument are as follows: 1) Plaintiff discovered a rat poison pellet in the apple processing area two years earlier, in March, 2004; 2) on another occasion in 2004, someone at Plaintiff's plant apparently threw a plastic bottle into a processing strainer; 3) on some unspecified occasion, an employee "threw a mercury thermometer into a filler bowl which broke and got into product";[7] 4) Ag. & Markets inspected the apples at the various storage facilities before they were shipped to Plaintiff,

---

[6] Defendant also makes a cursory argument that summary judgment should be denied because discovery is not complete. See, Def. Memo of Law [#121] at p. 17. However, Defendant has not made a properly supported application under Rule 56(d). Moreover, this motion has been pending for an extended period of time, and Defendant has never offered any additional discovery in support of its opposition.

[7] Def. Memo of Law [#121] at p. 7.

and never mentioned finding rat poison; 5) Defendant had instructed its suppliers not to use rodent bait inside the storage facilities; 6) Plaintiff did not complete written incident reports regarding the initial incidents until February 16, 2006, which, Defendant maintains, "calls into question the genesis of the rat poison";[8] and 7) Plaintiff reported the incidents to the FDA's Criminal Investigation Unit, which, Defendant contends, suggests that the contamination was the result of internal tampering.  Based on those facts and arguments, Defendant asserts that "[t]he plaintiff has not and cannot meets its burden [of] establishing that the subject incidents of the discovery of rodenticide were not the result of employee tampering."[9]  However, the Court disagrees and finds that those facts, when considered separately or together, are not sufficient to create a genuine triable issue of fact.

At the outset, the prior incidents of contamination do not permit a reasonable inference that the subject incidents were the result of tampering by one of Plaintiff's employees.  In that regard, the prior incidents are remote in time, having occurred years before the subject incidents.  Furthermore, no explanation is offered as to the source of the "lone pellet" that was discovered in 2004.  As for the plastic bottle that was discovered in a processing strainer in 2004, it is completely dissimilar from the contamination which occurred here, and in any event, the record contains no actual explanation for how the bottle got there. At most, we have Plaintiff's suspicion that it was thrown there intentionally by an employee.[10]  Similarly, the deposition testimony regarding the broken thermometer is utterly vague, and does not establish any connection between that incident and the

---

[8]Def. Memo of Law [#121] at p. 5.

[9]Def. Memo of Law [#121] at p. 11.

[10]Appendix to Def. Counter-Statement of Facts, Ex. C, Harvey Dep. at p. 45 ("[W]e knew it didn't get there by itself.")

incidents in this action.[11]   In summary, there is nothing linking the prior incidents of contamination to the contamination at issue in this action.

The fact that Ag. & Markets may have inspected Defendant's apples also does not create a triable issue of fact.  In that regard, Defendant cites testimony by Defendant's owner indicating merely that Ag. & Markets "would inspect the apples once they arrived at the storage facility."[12]  Defendant does not indicate that Ag. & Markets inspected the apples immediately prior to them being shipped to Plaintiff.  Such inspection, therefore, would not uncover contamination that occurred while the apples were in storage.  Moreover, the record is unclear regarding the exact nature of the inspection, but at most indicates that the inspection consisted only of "taking a sample" and having it tested.[13]   There is no indication that Ag. & Markets conducted a thorough inspection of all of Defendant's apples, or that any inspection was done for the presence of rodenticide.

Additionally, the fact that Defendant instructed its suppliers not to use rodenticide inside their storage facilities is irrelevant, particulary in view of the fact that Orchard Dale disregarded the instruction.  In addition, the evidence very strongly, if not conclusively, suggests that C.W. Cold Storage's bait traps somehow ended up in a bin of apples, notwithstanding Defendant's instructions that such traps only be used outdoors.

---

[11] *See*, Appendix to Def. Counter-Statement of Facts, Ex. C, Harvey Dep. at p. 45 ("Q. What else has occurred at this plant site; what other type of tampering issues have occurred at that plant site?  A. The one that I know of was there was a mercury thermometer that had been put in the filler bowl that broke and the mercury got into the product.  Q. Where is the filler bowl in the process here; what does that mean?  A. That's where the product is filled.  Q. Okay.").

[12] Appendix to Defendant's Counter-Statement of Facts, Ex. F, Dobbins Dep. at p. 24.

[13] *See*, Appendix to Defendant's Counter-Statement of Facts, Ex. G, D'Anniballe Dep. at p. 70 ("Q. Do you know what that inspection consists of?  A. It consists of taking a sample and, you know, testing the sample for, you know – well, I guess I'm not – I guess I'm not entirely sure.  But I know they take a sample and, you know, do certain tests of the sample to see if it's – see if it's proper – you know, if it would be acceptable.  I believe – just – I believe it is based on Beech-Nute specs.").

Furthermore, the fact that Plaintiff waited until February 16, 2006, before preparing written incident reports concerning the first two incidents is not probative as to the source of the rodenticide. On this point, Defendant suggests that Plaintiff's delay in preparing the reports indicates that Plaintiff was unsure of the source of the rodenticide.[14] Even if Plaintiff's uncertainty, at that point in time, could create a triable issue of fact, which is doubtful, the Court disagrees with Defendant's argument, and notes that after each of the first two discoveries, Plaintiff immediately notified Defendant of the contamination and returned the affected apples to Defendant. It is evident, therefore, that Plaintiff believed the contamination came from Defendant's apples. At the very least, it appears obvious that the contamination on February 13, 2006, can be traced back to C.W. Cold Storage.

Lastly, for the same reasons just discussed, no triable issue is created by the fact that Plaintiff contacted the FDA's Criminal Investigation office. As already mentioned, Defendant's argument on this point is partially based on the false premise that someone initially told the FDA about employee tampering.[15] In fact, the complaint was that Plaintiff was allowing contamination into its food products. The complaint therefore pertained to Plaintiff's handling of the contamination, not the source of the contamination. Similarly, the record indicates that the FDA's investigation concerned primarily, if not exclusively, Plaintiff's response to the contamination, as opposed to the source of the contamination. Although Plaintiff admits that it had some uncertainty about whether the contamination was

---

[14]Defendant states: "If Beech-Nut were such a diligent record keeper and was certain that the rodenticide came from the apples provided by Thruway and not from another source, query why they would wait until February 16, 2006 to prepare these reports. This further goes to show that there are questions of fact as to whether these incidents are the result of employee tampering.") Def. Memo of Law [#121] at p. 6.

[15]See, footnote 5. Defendant also relies on an affidavit from its expert witness, Robert Becker. However, Becker's affidavit merely opines, in conclusory fashion, that Plaintiff should have done a more thorough investigation to determine whether the contamination was caused by employee sabotage. Becker does not explain why Plaintiff's investigation was deficient, nor does he assert that the actual evidence of record establishes that the contamination was caused by employee sabotage.

intentionally caused by an employee, the actual evidence is not sufficient to create a triable issue of fact on that point.

In summary, Defendant's arguments are based on conjecture or surmise, which are insufficient to create a triable issue of fact. Consequently, the Court will grant Plaintiff's motion for partial summary judgment as to liability.

## CONCLUSION

Plaintiff's motion [#114] for partial summary judgment, as to liability on the first, second, third and fifth causes of action, is granted.

SO ORDERED.

Dated:   February 11, 2014
         Rochester, New York

                                  ENTER:

                                  /s/ Charles J. Siragusa
                                  CHARLES J. SIRAGUSA
                                  United States District Jusdge