UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MILNOT HOLDING CORPORATION,

                    Plaintiff,                    DECISION AND ORDER

-vs-

                                                08-CV-6140 CJS

THRUWAY PRODUCE, INC.,

                    Defendant.

_____

THRUWAY PRODUCE, INC.,

                      Third-Party Plaintiff,

-vs-

R.M. ZINGLER FARMS, LYNOAKEN FARMS, INC.,
K.M. DAVIES CO., INC., ORCHARD DALE FRUIT
FARM, INC. and C.W. COLD STORAGE, INC.,

                  Third-Party Defendants.

_____

INTRODUCTION

     This began as a diversity action for breach of a contract between a baby food manufacturer, Milnot Holding Corporation ("Milnot"), and its apple supplier, Thruway Produce, Inc. ("Thruway"), in which Milnot maintained that Thruway supplied apples that were contaminated with rat poison. In response to that claim, Thruway asserted third-party claims against its apple suppliers, R.M. Zingler Farms ("Zingler"), Lynoaken Farms, Inc. ("Lynoaken"), K.M. Davies Co., Inc. ("Davies"), Orchard Dale Fruit Farm, Inc. ("Orchard Dale") and C.W. Cold Storage, Inc. ("C.W."). The third-party defendants, in turn, asserted cross-claims against each other. Now before the Court is Zingler's motion for summary judgment (Docket No. [#124]), which is opposed by only one party, C.W., who is asserting a cross-claim against Zingler for "contribution and/or indemnification." Zingler's application is granted.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case viewed in the light most-favorable to C.W. At all relevant times, Milnot owned Beech-Nut Nutrition Corporation ("Beech-Nut"), which operated a food processing plant in Canajoharie, New York. The Beech-Nut plant produced "an assortment of baby and toddler food products." Complaint [#1] at ¶ 8. In 2005, Milnot and Thruway entered into a contract whereby Thruway agreed to be the exclusive supplier of apples to Milnot, "for the 2005/2006 season." *Id*. at ¶ 9. Thruway purchased the apples from various growers, including Zingler, and stored the apples at various facilities, including a storage operated by C.W., until they were needed by Beech-Nut.

Pursuant to Zingler's agreement with Thruway, it delivered its apples to C.W. for storage. Specifically, Zingler picked its apples, loaded them into bins, and transported them directly from the orchard to C.W.'s storage facility, whereupon they became the property of Thruway. Zingler did not use any type of rodenticide in its orchards.

On four occasions in 2006, Beech-Nut found poisonous rodent bait, containing Brodifacoum and/or Bromadiolone, mixed in with apples that had been supplied by Thruway. However, the only incident which appears to involve Zingler occurred on February 13, 2006, when one of Beech-Nut's forklift drivers was dumping a bin of apples into a processing hopper and observed foreign objects mixed in with the apples. Upon inspection, Beech-Nut found four rectangular plastic containers, with holes cut in them, which appeared to be homemade rodent bait stations. The boxes contained a bluish-green rodenticide material in both solid and granular form. According to the description given by the forklift operator, the plastic boxes had been in the bottom of the apple bin, beneath the

apples being dumped. Beech-Nut determined that the bin from which the apples had come belonged to Zingler, and that the apples had been previously stored at C.W. Cold Storage.

C.W. admits that it used homemade bait boxes at the relevant time, similar to those found in the apple bin. In that regard, C.W.'s half-owner, Robert Welch ("Welch"), was deposed in this action, and stated the following:  1) C.W. used bait boxes outside of its storage facility; 2) in 2005-2006, C.W. had a total of approximately 72 boxes around its storage buildings; 3) the bait boxes were placed around the storage facility by C.W.'s employee, Dan Gilbert ("Gilbert"); 4) Gilbert created the homemade bait boxes, rather than using commercial bait boxes, for cost-saving reasons; 5) the plastic boxes found at Beech-Nut's plant were "similar in style to the bait boxes that C.W. Cold Storage was making," and "look[ed] familiar"[1] to Welch; 6) the only difference between C.W.'s boxes and the boxes found by Beech-Nut was that *the bait* inside the boxes found by Beech-Nut appeared "melted";[2] 7) Thruway informed C.W. that the boxes found at the Beech-Nut plant were "similar to what [C.W.] ha[d]";[3] 8) upon being told that bait boxes were found in the apples, Welch considered it a "pretty safe assumption" that the boxes were C.W.'s;[4] 9) Welch asked Gilbert to look and see if any of C.W.'s bait boxes were missing, and Welch "think[s] he [Gilbert] maybe mentioned that there was some missing," "from . . . one of the side buildings" where Thruway apples were being stored;[5] 10) Welch had Gilbert "go around

---

[1] Welch Deposition at pp. 41, 48 & 102.

[2] Welch Deposition at p. 103.  Welch's testimony on that point therefore indicates that the boxes themselves were identical to the ones found by Beech-Nut.

[3] Welch Deposition at p. 44.

[4] Welch Deposition at p. 104.

[5] Welch Deposition at p. 47.  Upon further questioning, Welch indicated that Gilbert has indicated that boxes "plural" were missing. *Id*. at p. 48.

and retrieve" the bait boxes distributed around C.W.'s buildings; 11) Welch had Gilbert destroy the remaining boxes, purportedly because he "didn't know exactly how this happened, but [he] was going to make sure that if it was related to what [C.W.] had out there, that it wasn't going to happen again."[6]

Zingler's owner, R.M. Zingler, Jr., also testified at deposition that he spoke with C.W.'s co-owner, Clark Whited ("Whited"), who "acknowledged that the mouse bait stations in question that were involved with [Zingler's] fruit were from his facility, [and] were manufactured at his facility and had nothing to do with [Zingler]."[7]

As for how the bait boxes could have possibly come to be inside one of Zingler's bins, the following testimony by Welch is suggestive:

> Q. [T]ypically during the storage season, would you have extra bins – empty bins laying around?
>
> A. We would have a lot of Motts bins laying around.
>
> Q. Did C.W. Cold Storage use any of the apple bins for any purpose for storage or anything other than apples?
>
> A. We have used a Motts bin for trash, to pick up trash. My partner has used it for storing some refrigeration in.
>
> ***
>
> Q. And over the years, at least in the course of this work, have there been occasions when bins have been dropped?
>
> A. There has been bins that have been dropped.
>
> Q. Bins that have come apart?

---

[6]Welch Deposition at p. 42.

[7]Bond Reply Affirmation, Ex. 17, Zingler Dep. at p. 27.

>A. Bins have come apart.
>
>Q. And what would you do in those circumstances?
>
>A. Depending upon the amount, sometimes we call Thruway Produce to bring in more bins. We have rejected boxes that have fallen apart. There has been sometimes we used – Thruway had an extra box. [sic] Typically we don't have an excess amount of Thruway boxes here. We might have one or two and we might use that to put the apples in.

Docket No. [#136], Ex. 10, Welch Deposition at pp. 93-95.

Additionally, the FDA conducted an investigation of C.W., during which Gilbert indicated that four of his homemade bait traps were missing.[8] The FDA further reported that based on its interview of C.W. employees, "it is possible that the rodent bait traps were accidentally left in a wooden bin, stored and then subsequently used to fill apples from a damaged bin."[9] In that regard, Gilbert and/or another employee told the FDA that they had placed the bait boxes in an apple bin when distributing the bait boxes around the property, and that some of the boxes may have been left in the apple bin.

Zingler maintains that it is entitled to summary judgment, since there is no evidence that it was responsible for the bait traps being mixed in with its apples. C.W. opposes the motion, and contends that "there is an issue of fact as to whether Zingler Farms is responsible for the presence of bait boxes at the Beech-Nut facility."[10]

---

[8] Bond Reply Affirmation, Exhibit 18 at p. 2 ( "The on-site Manager confirmed that he made the rodent traps and that he was missing four of them."); *see also, id*. at p. 5 (After being shown pictures of the bait boxes discovered at the Beech-Nut plan, "Gilbert acknowledged that those containers were exactly what he had used and he further stated that he was missing four containers.").

[9] *Id*.

[10] C.W.'s Memo of Law [#145] at p. 15.

DISCUSSION

*Rule 56*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial.  Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants.") (emphasis added; citations and internal quotation marks omitted); *see also, D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some *hard evidence* showing that its version of the events is not wholly fanciful.") (emphasis added); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a genuine issue of material fact exists for trial, we are obliged carefully to distinguish between evidence that allows for a reasonable inference . . . and evidence that gives rise to mere speculation and conjecture.") (citation and internal quotation marks omitted).

C.W. maintains that there is a triable issue of fact as to whether Zingler "is responsible for the presence of the bait boxes," but the Court disagrees. Although the bait boxes were found in a bin of Zingler's apples, the record nevertheless cannot support a reasonable inference that Zingler was the source of the boxes, or that Zingler is in any way liable for their presence. The bait boxes were distinctive, homemade items, and the ones found by Beech-Nut were identical to the ones made by C.W.. Gilbert admitted the point to the FDA. Welch also testified to that fact, based on photographs, and the only thing preventing a side-by-side comparison of the actual boxes is the fact that C.W. destroyed the remaining boxes.[11] For C.W.'s argument to have any merit, there would have to be some explanation, supported by evidence, for how Zingler could have possessed bait boxes identical to C.W.'s homemade/custom-made boxes. There is none. In short, while a reasonable inference can be drawn that the boxes originated with C.W., no such inference can be drawn as to Zingler.

## CONCLUSION

Zingler's motion [#124] for summary judgment is granted as to all claims, counterclaims and cross-claims against it. The Clerk is directed to terminate Zingler as a party to this action.

SO ORDERED.

Dated: February 26, 2014
Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Jusdge

---

[11]As C.W. points out, Welch initially indicated at his deposition only that the boxes appeared similar. However, upon further questioning, Welch admitted that the only difference between them was the appearance of the bait. Consequently, it is established that the boxes were identical.