UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MILNOT HOLDING CORPORATION,

                                  Plaintiff,                          DECISION AND ORDER

-vs-
                                                                      08-CV-6140 CJS

THRUWAY PRODUCE, INC.,

                                  Defendant.

_____

THRUWAY PRODUCE, INC.,

                                  Third-Party Plaintiff,

-vs-
R.M. ZINGLER FARMS, LYNOAKEN FARMS, INC.,
K.M. DAVIES CO., INC., ORCHARD DALE FRUIT
FARM, INC. and C.W. COLD STORAGE, INC.,

                                  Third-Party Defendants.

_____

INTRODUCTION

        This began as a diversity action for breach of a contract between a baby food

manufacturer, Milnot Holding Corporation ("Milnot"), and its apple supplier, Thruway

Produce, Inc. ("Thruway"), in which Milnot maintained that Thruway supplied apples that

were contaminated with rat poison.  In response to that claim, Thruway asserted third-party

claims against its apple suppliers –  R.M. Zingler Farms ("Zingler"), Lynoaken Farms, Inc.

("Lynoaken"), K.M. Davies Co., Inc. ("Davies") and Orchard Dale Fruit Farm, Inc. ("Orchard

Dale"), and a cold-storage operator, C.W. Cold Storage, Inc. ("C.W.").  The third-party

defendants, in turn, asserted cross-claims against each other.  Now before the Court is

C.W.'s motion for summary judgment (Docket No. [#129]), and Thruway's cross-motion

[#136] for partial summary judgment against C.W. or, in the alternative, for leave to file an

amended complaint.  C.W.'s motion is granted, and Thruway's cross-motion is denied.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.  At all relevant times, Milnot owned Beech-Nut Nutrition Corporation ("Beech-Nut"), which operated a food processing plant in Canajoharie, New York.  The Beech-Nut plant produced "an assortment of baby and toddler food products." Complaint [#1] at ¶ 8.  In 2005, Milnot and Thruway entered into a contract whereby Thruway agreed to be the exclusive supplier of apples to Beech-Nut, "for the 2005/2006 season." *Id*. at ¶ 9.  The contract required Thruway to supply apples that were free of the rodenticides Brodifacoum and Bromadiolone, which are commonly found in baits used to kill rats and mice.

Thruway did not grow the apples that it supplied to Beech-Nut.  Instead, Thruway purchased the apples from various growers, and stored them at various facilities, including a storage operated by C.W., until they were needed by Beech-Nut.  At the relevant time, the storage contract between Thruway and C.W. was oral, not written.  The oral agreement did not include any provision requiring C.W. to indemnify Thruway.

On four occasions in 2006, Beech-Nut found rodent bait containing Brodifacoum and/or Bromadiolone mixed in with apples that had been supplied by Thruway.  However, the only incident that appears to implicate C.W. occurred on February 13, 2006, when one of Beech-Nut's forklift drivers dumped a bin of apples into a processing hopper and observed foreign objects mixed in with the apples.  Upon inspection, Beech-Nut found four rectangular plastic containers, with holes cut in them, which appeared to be homemade rodent bait stations.  The boxes contained a bluish-green rodenticide material in both solid and granular form.[1]  According to the description given by the forklift operator, the plastic

---

[1]C.W. argues that there is no evidence in the record that the material in the boxes was rodenticide. The Court disagrees, since C.W. admitted both that its employee created the boxes and filled them with rodenticide, and that the boxes found by Beech-Nut still contained rodenticide. *See, e.g.*, Welch Deposition

boxes had been in the bottom of the apple bin, beneath the apples being dumped.[2] Beech-Nut determined that the bin from which the apples had come belonged to Zingler, and that the apples had been previously stored at C.W. Cold Storage.

By separate Decision and Order, the Court granted summary judgment for Zingler, finding no evidence that Zingler was responsible for the bait boxes.  Consequently, the only other party in this action that could be found liable to Thruway for the bait boxes is C.W., which admits that it used identical homemade bait boxes at the relevant time.   In that regard, C.W.'s half-owner, Robert Welch ("Welch"), was deposed in this action, and stated the following:  1) C.W. used bait boxes outside of its storage facility; 2) in 2005-2006, C.W. had a total of approximately 72 bait boxes around its storage buildings; 3) the bait boxes were placed around the storage facility by C.W.'s employee, Dan Gilbert ("Gilbert"); 4) Gilbert created the homemade bait boxes, rather than using commercial bait boxes, for cost-saving reasons; 5) the plastic boxes found at Beech-Nut's plant were "similar in style to the bait boxes that C.W. Cold Storage was making," and "look[ed] familiar"[3] to Welch; 6) the only difference between C.W.'s boxes and the boxes found by Beech-Nut was that *the bait* inside the boxes found by Beech-Nut appeared "melted";[4] 7) Thruway informed

---

at pp. 31-32 (W.C. put block bait in the traps) and p. 103 (Welch indicated that there was melted block bait in the boxes shown in Beech-Nut's photos: ""The only difference that I would say is that the block bait in there seems fairly melted, and that's not typical.").

[2]Even though the bait boxes were discovered before any of the apples in the same bin were processed, Beech Nut, in conjunction with the FDA, eventually agreed not to sell the product that was being produced at that time, and recalled product that had already been shipped.

[3]Welch Deposition at pp. 41, 48 & 102.

[4]Welch Deposition at p. 103.  Welch's testimony on that point therefore indicates that the boxes themselves were identical to the ones found by Beech-Nut.

C.W. that the boxes found at the Beech-Nut plant were "similar to what [C.W.] ha[d]";[5] 8) upon being told that bait boxes were found in the apples, Welch considered it a "pretty safe assumption" that the boxes were C.W.'s;[6] 9) Welch asked Gilbert to look and see if any of C.W.'s bait boxes were missing, and Welch "think[s] he [Gilbert] maybe mentioned that there was some missing," "from . . . one of the side buildings" where Thruway apples were being stored;[7] 10) Welch had Gilbert "go around and retrieve" the bait boxes distributed around C.W.'s buildings; 11) Welch had Gilbert destroy the remaining boxes, purportedly because he "didn't know exactly how this happened, but [he] was going to make sure that if it was related to what [C.W.] had out there, that it wasn't going to happen again."[8]

Zingler's owner, R.M. Zingler, Jr., also testified at deposition that he spoke with C.W.'s co-owner, Clark Whited ("Whited"), who "acknowledged that the mouse bait stations in question that were involved with [Zingler's] fruit were from his facility, [and] were manufactured at his facility and had nothing to do with [Zingler]."[9]

As for how the bait boxes could have possibly come to be inside one of Zingler's bins, the following testimony by Welch is suggestive:

Q. [T]ypically during the storage season, would you have extra bins – empty bins laying around?

A. We would have a lot of Motts bins laying around.

---

[5]Welch Deposition at p. 44.

[6]Welch Deposition at p. 104.

[7]Welch Deposition at p. 47.  Upon further questioning, Welch indicated that Gilbert has indicated that boxes "plural" were missing. *Id*. at p. 48.

[8]Welch Deposition at p. 42.

[9]Bond Reply Affirmation, Ex. 17, Zingler Dep. at p. 27.

Q. Did C.W. Cold Storage use any of the apple bins for any purpose for storage or anything other than apples?

A. We have used a  Motts bin for trash, to pick up trash.  My partner has used it for storing some refrigeration in.

***

Q. And over the years, at least in the course of this work, have there been occasions when bins have been dropped?

A. There has been bins that have been dropped.

Q. Bins that have come apart?

A. Bins have come apart.

Q. And what would you do in those circumstances?

A. Depending upon the amount, sometimes we call Thruway Produce to bring in more bins.  We have rejected boxes that have fallen apart.  There has been sometimes we used – Thruway had an extra box. [sic]  Typically we don't have an excess amount of Thruway boxes here.  We might have one or two and we might use that to put the apples in.

Docket No. [#136], Ex. 10, Welch Deposition at pp. 93-95.

Additionally, the Food and Drug Administration ("FDA") conducted an investigation of C.W.'s facility, during which Gilbert indicated that four of his homemade bait traps were missing.[10]  The FDA further reported that based on its interview of C.W. employees, "it is possible that the rodent bait traps were accidentally left in a wooden bin, stored and then

---

[10]Bond Reply Affirmation, Exhibit 18 at p. 2 ( "The on-site Manager confirmed that he made the rodent traps and that he was missing four of them."); see also, id. at p. 5 (After being shown pictures of the bait boxes discovered at the Beech-Nut plan, "Gilbert acknowledged that those containers were exactly what he had used and he further stated that he was missing four containers.").

subsequently used to fill apples from a damaged bin."[11]  In that regard, Gilbert and/or another employee told the FDA that they had placed the bait boxes in an apple bin when distributing the bait boxes around the property, and that some of the boxes may have been left in the apple bin.

As mentioned earlier, Milnot commenced this action against Thruway, asserting claims, under New York State law, for breach of contract and breach of warranties.  Milnot also asserted claims for negligence and strict products liability.  Milnot's Complaint [#1] refers to the fact that on March 7, 2006, "Milnot issued an 'Urgent Action Required' letter advising its customers that it was voluntarily withdrawing [recalling] Stage 3 Beech-Nut Naturals - Cinnamon Raisin Granola and Stage 2 Beech-Nut Naturals - Chiquita Bananans with Pears and Apples,"[12] which were the products being manufactured on February 13, 2006, when the bait boxes were discovered.  Milnot's Complaint further alleges that, "[a]s a result of the recall, Milnot sustained damages in the amount not less than $1,522,122." Complaint [#1] at ¶ 25.

With regard to the recall, the record indicates that Beech-Nut apparently did not believe that any contamination from the bait boxes affected the product that was being produced that day, since the bait boxes were discovered immediately, and the affected apples were discarded.  Consequently, Beech-Nut shipped some of that day's product to stores.  Beech-Nut did not consult the FDA before doing so.  Subsequently, though, after discussions with the FDA, Beech-Nut voluntarily recalled the product that had shipped, even though the record gives no indication that any of that product was actually affected by the bait-box contamination.

---

[11]*Id.*

[12]Complaint [#1] at ¶ 19

6

Thruway, in turn, asserted third-party claims against C.W., and the other third-party defendants, on the general premise that Thruway was merely a "middle man," and that the contamination was the fault of the third-party defendant apple growers and/or storage operators.  Specifically, Thruway asserted third-party claims for contribution, common-law indemnification and contractual indemnification.  Thruway did not assert claims for breach of contract.

Subsequently, in the first-party action, Milnot moved for partial summary judgment, as to liability, against Thruway, on the contract and warranty claims, but not the negligence or strict products liability claims.[13]  By separate Decision and Order, the Court granted Milnot's motion for partial summary judgment.

C.W. now moves for summary judgment on Thruway's third-party claims.   C.W. does not concede responsibility for the bait boxes found on that date, and maintains that there are issues of fact as to the origin of the bait boxes.  The Court disagrees, based on the factual record discussed above.  Nevertheless, C.W. maintains that, as a matter of law, even if it was the source of the bait boxes, it cannot be found liable to Thruway under the contribution and indemnification theories alleged in Thruway's Third-Party Complaint.  C.W. maintains that since Milnot's claims against Thruway are essentially contractual in nature, Milnot cannot recover against Thruway on the negligence and strict products liability causes of action.   Consequently, C.W. argues, Thruway cannot prevail against C.W. on its common-law contribution/indemnification claims, since such relief is not available in connection with contract claims.  At the same time, C.W. maintains that

---

[13]Milnot's negligence claim asserts that Thruway "had a duty to exercise reasonable care in introducing, supplying, selling and/or distributing apples to Beech-Nut," which Thruway breached, and that such duty was "independent of any duty under the sales contract." Complaint [#1] at ¶ ¶ 59-60.  Milnot's strict products liability claim asserts that the apples supplied by Thruway were "unreasonably dangerous in that they contained pesticides in excess of federal tolerances." Complaint [#1] at ¶ 66.

Thruway cannot succeed on its contractual indemnification claim, since C.W. and Thruway had an oral contract which did not include any requirement for C.W. to indemnify Thruway. Additionally, C.W. contends that it is not liable to Thruway in any event for damages relating to the product recall, since the presence of the bait boxes in the apples was not the proximate cause of the recall.

Thruway cross-moves for partial summary judgment, as to liability, on the claims against C.W.[14]  In that regard, Thruway contends that C.W. is responsible for the bait boxes, and that Thruway is therefore entitled to judgment as to liability.  Alternatively, Thruway requests leave to amend the third-party complaint, "to assert additional causes of action for breach of contract and breach of warranties."[15]

## DISCUSSION

*Thruway's Motion to Amend*

At the outset, as the Court already indicated during oral argument, Thruway's alternative motion to amend is denied, as untimely brought.  On this point, the relevant law is that although "a court should freely give leave to amend where justice so requires, Fed.R.Civ.P. 15(a)(2), this must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Velez v. Burge*, 483 Fed.Appx. 626, 628, 2012 WL 1889402 at *1 (2d Cir.2012) (citations and internal quotation marks omitted).  In the instant case, on January 20, 2009, the Honorable Marian W. Payson, United States Magistrate Judge, issued an Amended Scheduling Order [#62], which directed, *inter alia*, that "[a]ll motions to join other parties and to amend the pleadings shall be filed on or before March 20, 2009."  Thruway did not

---

[14]Docket No. [#136-17] at p. 1.

[15]Docket No. [#136-17] at p. 3.

file its motion to amend by that deadline, but instead, filed its motion to amend [#136] on November 1, 2011.  In response to the Court's questioning at oral argument, Thruway's counsel indicated that there was good cause to extend Magistrate Judge Payson's deadline, because discovery took place after her deadline, with the final deposition having been completed in November 2010.  Thruway's counsel admitted, though, that after completing discovery, it did not occur to him to seek an extension of the deadline for filing amended pleadings.  As a result, the motion to amend was filed more than two years after the deadline, and a year after discovery was completed.  On these facts, the Court finds that Thruway has not shown good cause for extending the deadline, and the motion to amend is denied.

*Rule 56*

Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

A party cannot demonstrate a triable issue of fact based on mere speculation or conjecture. *See, e.g., U.S. v. Potamkin Cadillac Corp.*, 689 F.2d 379, 381 (2d Cir. 1982) ("[I]n order to defeat a motion for summary judgment, the opposing party must set forth *specific facts* showing that there is a genuine issue for trial.  Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the

9

litigants.") (emphasis added; citations and internal quotation marks omitted); *see also,*
*D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may
not rely on mere conclusory allegations nor speculation, but instead must offer some *hard*
*evidence* showing that its version of the events is not wholly fanciful.") (emphasis added);
*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) ("In determining whether a
genuine issue of material fact exists for trial, we are obliged carefully to distinguish
between evidence that allows for a reasonable inference . . .  and evidence that gives rise
to mere speculation and conjecture.") (citation and internal quotation marks omitted).

The parties agree that New York State Law substantive law applies to the subject
claims.

### Milnot's Tort Claims Against Thruway

C.W. maintains that Thruway cannot be liable to Milnot for negligence or strict
products liability, and that Thruway therefore cannot seek common law contribution or
indemnification from C.W.  C.W.'s argument in this regard is based on the assumption that
Milnot is prevented from seeking recovery against Thruway in tort, because its claims are
more properly classified as contractual in nature.  C.W. argues that Milnot tacitly admitted
that point when it moved for partial summary judgment against Thruway on its contractual
claims, but not its tort claims.  For support, C.W. cites *Clark-Fitzpatrick, Inc. v. Long Island*
*R.R. Company*, 70 N.Y.2d 382, 389-90 (1987) and *County of Suffolk v. Long Island*
*Lighting Co.*, 728 F.2d 52, 62 (2d Cir. 1984).  Essentially, C.W. is asking the Court to rule,
as a matter of law, that Milnot's negligence and product liability claims against Thruway
lack merit, even though Thruway never moved to have them dismissed.

Significantly, Thruway has not disputed C.W.'s contention that Milnot cannot
succeed on its tort claims.  In that regard, although Thruway filed three separate briefs in

connection with the subject motions [#136-17][#152][#166], none of them dispute C.W.'s argument on this point.[16]  To the contrary, Thruway's papers confirm C.W.'s point, which is that the tort claims are merely duplicative of the breach of contract claims, and are therefore not actionable.[17] *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d at 389 ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.") (citations omitted).[18]  Accordingly, Thruway has conceded that its liability to Milnot is based solely on breach of contract, not tort.  Consequently, any third-party liability that C.W. might face would be based on Thruway having been found to have breached its contractual obligations to Milnot.

<u>*Thruway's Claims for Contribution and Common-Law Indemnification*</u>

Since Thruway's liability to Milnot is contractual, the Court agrees with C.W. that Thruway cannot prevail on its claims for contribution and common-law indemnification.  At the outset, Thruway cannot maintain an action for contribution, because "[u]nder New York law there is no right of contribution between parties whose potential liability to a third party is for economic loss resulting only from breach of contract." *In re Crazy Eddie Securities Litig.*, 802 F.Supp. 804, 815 (E.D.N.Y. 1992); *see also, Board of Educ. of Hudson City*

---

[16]Milnot also does not dispute the argument.  In that regard, while Milnot is not technically involved in the subject motion, it nevertheless submitted an affidavit in support of its supposed adversary, Thruway, concerning an evidentiary issue raised by C.W.. *See*, Docket No. [#158], McMonagle Declaration, submitted "in support of Thruway's motion for summary judgment against third-party defendant C.W. Cold Storage, Inc." Tellingly, while Milnot addressed the evidentiary issue raised by C.W., it did not dispute C.W.'s argument regarding Milnot's tort claims lacking merit.

[17]*See, e.g.*, Thruway Memo of Law [#152] at p. 6 ("Milnot's allegations against Thruway do not raise arguments of independent acts apart from the alleged failure of its growers and/or storage facilities that it used on behalf of Milnot."); *see also, id*. at p. 7 ("Thruway retained no direct independent duty to Milnot to deliver apples free from rodenticide.").

[18]No such independent duty has been identified in this action.

*School Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 28, 517 N.E.2d 1360, 1364 (1987) ("[T]he existence of some form of tort liability is a prerequisite to application of [New York Civil Practice Law and Rules ("C.P.L.R.")  § 1401]. We find nothing in the legislative history or the common-law evolution of the statute on which to base a conclusion that CPLR 1401 was intended to apply in respect to a pure breach of contract action such as would permit contribution between two contracting parties whose only potential liability to the plaintiff is for the contractual benefit of the bargain.").[19]  Therefore, C.W. is entitled to summmary judgment on the contribution claim.

Thruway also cannot maintain an action for common-law indemnification against C.W., since in New York, a party cannot obtain common-law indemnification to recover damages resulting from its own breach of contract.  On this point, in *Knight v. H.E. Yerkes and Assocs., Inc.*, 675 F.Supp. 139, 143 (S.D.N.Y. 1987), the court stated:

> Under New York law . . . indemnity may be implied "to allow one who was compelled to pay for the wrong of another to recover from the wrongdoer the damages paid to the injured party." *Hanley v. Fox*, 97 A.D.2d 606, 607, 468 N.Y.S.2d 193, 194 (3d Dept.1983) (*citing D'Ambrosio v. City of New York*, 55 N.Y.2d 454, 460–61, 435 N.E.2d 366, 368–69, 450 N.Y.S.2d 149, 151–52). In a case of implied indemnity, however, "where the party seeking indemnification is himself at least partially at fault, indemnity will not be implied." *Hanley v. Fox*, 97 A.D.2d at 607, 468 N.Y.S.2d at 194.  Because the underlying action sounds in contract, not in tort, there is no possible set of facts on which it can be true that Yerkes was not at least partially responsible for harm, for it was Yerkes that allegedly breached the contract, not O'Leary. There can therefore be no cause of action in indemnity.

---

[19]Even assuming that Thruway was facing liability in tort, its claim for contribution would be an improper vehicle here, since it is claiming that it had no part in the alleged wrongdoing, and that its liability is due strictly to C.W.'s wrongdoing. Since Thruway is not seeking to apportion liability between itself and C.W. based on their respective tortious wrongdoing, a claim for contribution does not lie. See, *D'Ambrosio v. City of New York*, 55 N.Y.2d 454, 462, 435 N.E.2d 366, 369 (1982) ("[W]here one is held liable solely on account of the negligence of another, indemnification, not contribution, principles apply to shift the entire liability to the one who was negligent.").

(footnote omitted); *see also*, *Facilities Development Corporation v. Miletta*, 180 A.D.2d 97, 104, 584 N.Y.S.2d 491, 496 (3d Dept. 1992) (Denying claim for implied indemnification, stating: "If, in fact, Detroit breached its obligations under its contract with Mechanical and thereby caused all or a portion of the economic loss sustained by plaintiff, Miletta cannot be held liable for the same loss because the proximate cause of that loss would be Detroit's breach of contract, not anything Miletta did or did not do."); *Commonwealth Insurance Co. v. Thomas A. Greene & Company, Inc.*, 709 F.Supp. 86, 89 (S.D.N.Y. 1989) ("Greene is not entitled to common law indemnification from North River or Crum & Forster because it is being sued for its own negligence, breach of contract, breach of warranty and breach of fiduciary duties, not for actions of North River or Crum & Forster."); *Richards Plumbing & Heating Co., Inc. v. Washington Group International, Inc.*, 59 A.D.3d 311, 312, 874 N.Y.S.2d 410, 411 (1st Dept. 2009) ("The court properly dismissed the construction manager's third-party claim for common-law indemnification since plaintiff's claims and the owner's cross claims allege breach of contract by the construction manager, not vicarious liability attributed solely to the fault of the architect."); *Edgewater Construction Co., Inc. v. 81 & 3 of Watertown, Inc.*, 252 A.D.2d 951, 952, 675 N.Y.S.2d 722, 724 (4th Dept. 1998) ("Because Edgewater is suing 81 & 3 for its breach of the construction contract and is not seeking to hold 81 & 3 vicariously liable for any negligence by Wal-Mart, 81 & 3 has not cause of action against Wal-Mart for common-law or implied indemnification.") (collecting cases).

As the foregoing cases indicate, if Milnot were seeking to hold Thruway vicariously liable for C.W.'s actions, then Thruway could maintain a claim against C.W. for common-law indemnification. However, since Milnot is suing Thruway for Thruway's own breach of contract, Thruway cannot maintain a common-law indemnification claim against C.W.

13

Therefore, C.W. is entitled to summary judgment on the common-law indemnification claim.

<u>*Thruway's Claim for Contractual Indemnification*</u>

It is undisputed that the only contract between Thruway and C.W. is an oral contract that did not address indemnification.  Consequently, there is no express agreement regarding indemnification.  Thruway nevertheless maintains that "implied contractual indemnification" applies, because "the nature of the relationship between Thruway and C.W. Cold Storage transcends the normal ordinary business relationship."[20]  On this point, Thruway contends that "indemnification is implied in contract, when the proposed indemnitee holds a non-delegable duty to a third-party, but transfers this responsibility to the proposed indemnitor by implied agreement."[21]  Thruway further contends that it transferred its non-delegable duty, to provide apples  to Milnot that were free of rodenticide, to C.W..

However, the Court disagrees, since the indemnification to which Thruway refers is a type of implied indemnification which, as already discussed, does not apply where, as here, Thruway's liability arises from its own breach of contract.  In that regard, the cases on which Thruway relies are inapposite.  For example, *Playwell Toy, Inc. v. Bureau Veritas Consumer Products Services, Inc.*, No. 03-CV-0704C(SC), 2007 WL 2892031 (W.D.N.Y. Sep. 28, 2007), involved a toy manufacturer who was sued *in tort* for products liability, and then sought indemnification from the firm that had conducted safety testing for the manufacturer.   The toy manufacturer was not sued for breach of contract.  Another case cited by Thruway, *Lasalle Bank Nat. Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ.

[20]Thruway Memo of Law [#136-17] at p. 9.

[21]Thruway Memo of Law [#136-17] at p. 9.

7868(HB), 2003 WL 21671812 (S.D.N.Y. Jul. 16, 2003) is also factually inapposite. Thruway's reference to cases in which "the proposed indemnitee holds a non-delegable duty to a third party, but transfers this responsibility to the proposed indemnitor by implied agreement," such as in *Mas v. Two Bridges Associates by Nat. Kinney Corp.*, 75 N.Y.2d 680, 554 N.E.2d 1257 (1990), also misses the mark, since those cases involve situations where the proposed indemnitee is vicariously liable for another's tort, which is not the case here.[22]  Consequently, C.W. is entitled to summary judgment on Thruway's claim for contractual indemnification.

### *Proximate Causation of Damages Related to Recall*

C.W. also contends, as part of its motion for summary judgment, that it cannot be liable for any damage sustained by Milnot, since Milnot

> does not contend [that it] suffered damages as a result of the presence of contaminant allegedly found on February 13, 2006.  Rather, Milnot alleges it sustained damages due to a recall  of product distributed after the February 13th incident.  C.W. was not the proximate cause of the recall as a matter of law.

C.W. Memo of Law [#145] at p. 12.  C.W. maintains that the bait boxes and the rodenticide inside of them had nothing to do with the recall, since all of the apples that could have been affected by the rodenticide were discarded.  C.W. maintains, therefore, that although Milnot agreed to recall product at the FDA's request, such recall was unnecessary, or at least unrelated to the discovery of the bait boxes.  Alternatively, C.W. maintains that it was Milnot's own fault for shipping out the product that was manufactured on  February 13, 2006, without first checking with the FDA.   In response, Thruway maintains that C.W. is

---

[22]Thruway contends that it "is being held vicariously liable for the wrongdoing of C.W. Cold Storage." Thruway Memo of Law [#136-17] at p. 10.  That is incorrect – Thruway's liability to Milnot arises from Thruway's breach of its contract with Milnot, not vicarious liability.

responsible for the bait boxes, and is therefore also responsible for Milnot's damages.[23]
However, Thruway does not rebut C.W.'s argument regarding proximate causation.[24]

The Court agrees with C.W. that Thruway has not explained a sufficient theory of proximate cause relating to the recall of food produced on February 13, 2006.  Milnot was aware of the contamination incident and shipped the product anyway.  Additionally, Thruway has not shown how the product that was shipped could have been contaminated by C.W.'s bait boxes.  Accordingly, even assuming that Thruway had a viable claim against C.W., it could not recover damages related to Milnot's recall.

CONCLUSION

C.W.'s motion for summary judgment (Docket No. [#129]) is granted, and Thruway's cross-motion [#136] for partial summary judgment or, in the alternative, for leave to file an amended complaint, is denied.  The Clerk of the Court is directed to terminate C.W. as a party to this action.

SO ORDERED.

Dated:          March 4, 2014
                Rochester, New York

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Jusdge


---

[23]See, Thruway Memo of Law [#152] at p. 11.

[24]Thruway Reply Memo [#166] at p. 5.